IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SCOTTRADE, INC., <br><br> Plaintiff, <br><br> v. <br><br> VARIANT, INC. and STEPHEN C. WREN, <br><br> Defendants. | Case No. 4:13-cv-01710-HEA |

## AMENDED COMPLAINT

For its Amended Complaint, Plaintiff Scottrade, Inc. alleges as follows:

### The Parties

1.    Plaintiff Scottrade, Inc. ("Scottrade") is an Arizona corporation with its principal place of business in St. Louis, Missouri.

2.    Defendant Stephen C. Wren ("Wren") is a Texas resident. Wren permanently moved to Texas in late 2012.

3.    Defendant Variant, Inc. is a Wisconsin corporation. Variant, Inc. was incorporated by Defendant Stephen C. Wren solely for the purpose of pursuing patent infringement litigation. It has no offices. Variant, Inc. is managed by Defendant Stephen C. Wren.

4.    Variant Holdings, LLC ("Variant Holdings") is a Nevis limited liability company with a place of business in Charlestown, Nevis.

5.    Wren is the only known owner, officer, or employee of either Variant, Inc. or Variant Holdings.  At all times relevant to this lawsuit, Wren completely controlled both Variant,

5983715

Inc. and Variant Holdings and ignored corporate formalities such that it is appropriate to treat Wren, Variant, Inc., and Variant Holdings as a single entity.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this cause of action is between "citizens of different states" and the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because this cause of action is founded only on diversity of citizenship and this Court is within the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

8. This Court has personal jurisdiction over all Defendants because Wren, acting on his own behalf and on behalf of Defendants Variant Holdings and Variant, Inc., entered into multiple contracts in the State of Missouri, engaged in tortious conduct in the State of Missouri, and otherwise availed himself of the privileges of conducting business within the State of Missouri.

## The Inventions

9. Wren is the inventor of certain new and useful improvements in a system for electronically communicating between remote facilities and for facilitating transactions between central and remote facilities (the "Inventions"). The Inventions are the subject of the following United States Patents: 6,055,514 (the '514 Patent), 7,624,044 (the '044 Patent), and 7,379,900 (the '900 Patent).

10. Wren assigned his intellectual property rights in the Inventions to Variant Holdings, LLC on November 6, 2000. A copy of that assignment is attached as **Exhibit A**.

**The November 2000 License, Joint Venture and Partnership Agreement**

11.     On November 6, 2000, Scottrade entered into a license agreement (the "License Agreement") with Variant Holdings. Under the License Agreement, Scottrade and Variant Holdings agreed to form a company for the purpose of exploiting patent rights and know how associated with the Inventions (the "Partnership"). A copy of the License Agreement is attached as **Exhibit B**.

12.     Variant Holdings and Scottrade each had an obligation to fund 50% of the Partnership's efforts to exploit the patent rights and know how associated with the Inventions and in turn would share 50% of the profits from that endeavor. Although Scottrade provided approximately $700,000 in funding, Variant Holdings did not provide any money to fund the Partnership's efforts, nor did it share any of the profits from those efforts.

13.     Wren, through his alter ego Variant Holdings, initiated an arbitration with the American Arbitration Association in May of 2004, seeking (a) to terminate the Partnership formed under the License Agreement, and (b) a determination that Scottrade was obligated to pay 100% of the Partnership's costs.

14.     On January 14, 2005, the Arbitrator entered an award specifically finding that "each party retains all of its rights under the License Agreement" and that each party had a 50% funding obligation. A copy of the January 14, 2005, Award of Arbitration (the "Arbitration Award") is attached as **Exhibit C**.

15.     Notwithstanding the Arbitration Award, Wren has at all times relevant to this lawsuit taken the position that the Partnership was terminated and that neither he nor any of his alter ego entities owes any obligations to Scottrade under the License Agreement.

16. Variant Holdings has never complied with its obligation to fund 50% of the Partnership under the Arbitration Award. As the alter-ego of Variant Holdings, Wren is liable for that refusal to comply.

### Intellectual Property Rights under the License Agreement

17. The License Agreement defines "Patent Rights" as follows: "Patent Rights means rights to all patentable inventions and improvements which are disclosed in [Variant Holdings'] patent applications, each of which is entitled:  System for Marketing Goods and Services Utilizing Computerized Central and Remote Facilities, as well as any applications on the subject matter thereof filed by Variant or on its behalf, whether or not claiming priority from [certain patent applications filed on behalf of Variant]." Thus, under the License Agreement, Patent Rights includes all intellectual property rights in the Inventions.

18. The License Agreement includes "Patent Rights" in its definition of "Intellectual Property Rights."

19. The Intellectual Property Rights covered by the License Agreement include all rights in the '900 Patent, which is entitled "System for marketing goods and services utilizing computerized central and remote facilities" and was duly and legally issued on May 27, 2008. A copy of the '900 patent is attached as **Exhibit D (cover page only)**.

20. The Intellectual Property Rights covered by the License Agreement include all rights in the '044 Patent, which is entitled "System for marketing goods and services utilizing computerized central and remote facilities" and was duly and legally issued on November 24, 2009. A copy of the '044 patent is attached as **Exhibit E (cover page only)**.

**Scottrade's Right of First Refusal**

21.     Under the License Agreement, Scottrade has a right of first refusal with respect to any subsequent agreements concerning the Intellectual Property Rights:

> With respect to future agreements concerning the Intellectual Property Rights, VARIANT [HOLDINGS] intends to exploit such rights, but VARIANT [HOLDINGS], shall and hereby does grant SCOTTRADE a right of first refusal and at least sixty days to exercise this right before entering into any subsequent agreement concerning the Intellectual Property Rights.

22.     Under its right of first refusal, Scottrade has "the right, at its sole discretion, to enter into any subsequent agreements concerning the Intellectual Property Rights which VARIANT [HOLDINGS] or an affiliated organization negotiates with a third party, on the same terms and conditions as negotiated with said third party, to the exclusion of said third party."

23.     The sixty-day period in which Scottrade has the right to enter into any agreement to the exclusion of third parties is to be measured "from the time SCOTTRADE is actually notified, in writing, of the terms of the agreement as to which it has the right of first refusal."

**Other Contractual Rights**

24.     Under the License Agreement, Variant Holdings granted the Partnership an exclusive, non-assignable license for the use of the Intellectual Property Rights for financial service companies throughout the United States.  Under the License Agreement, Variant Holdings also granted the Partnership a non-exclusive, non-assignable license for the use of the Intellectual Property Rights in all other respects.

25.     Under the License Agreement, Scottrade and Variant Holdings each have a right to 50% of the Partnership's profits.

- 6 -

**Wren's Formation of Variant, Inc. and Efforts to Circumvent
His Contractual and Fiduciary Responsibilities**

26. Seeking to appropriate the Licensed Rights unto himself to the detriment of Scottrade and to keep all of the financial value in the Intellectual Property Rights to himself, Wren secretly formed a corporation (Variant, Inc.) and secretly purported to grant an exclusive license for the Intellectual Property Rights to that corporation.

27. Wren's secret grant violated Scottrade's contractual rights under the License Agreement's first refusal provision and the Partnership's contractual rights under both the exclusive license provision and non-exclusive license provision of the License Agreement.  It was also in direct violation of the Arbitrator's ruling that the parties to the License Agreement retained all of their contractual rights under that agreement.

28. On July 2, 2008 – barely more than a month after the '900 Patent was issued – Wren formed Variant, Inc. as a Wisconsin for-profit corporation under Chapter 180 of the Wisconsin Statutes.

29. On July 9, 2008, Wren caused Variant Holdings to enter into an Exclusive License Agreement with Variant, Inc. (the "ELA").  The ELA was entered into in the State of Missouri.

30. Under the ELA, Variant Holdings purportedly made Variant, Inc. the exclusive licensee of the '900 patent with rights to enforce that patent and sue infringers.

31. Under the ELA, Variant Holdings purportedly made Variant, Inc. the exclusive licensee of the '044 patent with rights to enforce that patent and sue infringer's.

32. Defendants never notified Scottrade, in writing or otherwise, that Variant Holding planned to enter into the ELA with Variant, Inc.

33. Following the execution of the ELA – and within two weeks of its incorporation – Variant, Inc. began exploiting the Intellectual Property Rights, filing numerous lawsuits against a variety of entities (including entities in the United States financial services industry) claiming infringement of the '044 Patent and the '900 Patent with and without the participation of Variant Holdings. Neither the Partnership nor Scottrade were joined as plaintiffs in any of these actions or notified that any of these actions were being filed.

34. Variant, Inc. (*i.e.*, in fact, Wren) has obtained in excess of $4 million dollars in settlement payments related to those patent infringement lawsuits. Because Scottrade was entitled to receive the same Intellectual Property Rights on the same terms as Variant, Inc. under the ELA, Scottrade, not Variant, Inc., should have been the recipient of those payments.

35. Scottrade did not learn of the existence of the ELA or Variant, Inc.'s lawsuits to exploit the Intellectual Property Rights until 2013, when it was subpoenaed by a defendant in one of those infringement actions.

### Count I – Alter Ego Liability

36. Scottrade incorporates by reference and realleges the allegations in the preceding paragraphs.

37. All or virtually all of Scottrade's negotiations, discussions, or other interactions with Variant Holdings were with Wren. In no aspect of Scottrade's interaction with Wren was there any meaningful distinction drawn between Wren and any of the entities subject to his personal control. Moreover, Variant, Inc. and Variant Holdings are substantially identical in terms of ownership, management, purpose, operation, and supervision.

38. Variant, Inc. and Variant Holdings share a single bank account with another Wren-owned entity, Variant USA.  Scottrade is informed and believes that Wren owns all or most of the capital of Variant Holdings and Variant, Inc.

39. Scottrade is informed and believes that Variant Holdings and Variant, Inc. have common directors and officers.

40. Scottrade is informed and believes that Wren finances both Variant Holdings and Variant, Inc.

41. Scottrade is informed and believes that Wren caused the incorporation of Variant, Inc. and the organization of Variant Holdings.

42. Scottrade is informed and believes that Variant, Inc. and Variant Holdings are grossly undercapitalized.

43. Neither Variant, Inc. nor Variant Holdings does any business except through or with Wren.

44. Neither Variant Holdings nor Variant, Inc. has ever held a Board of Directors meeting.

45. Scottrade is informed and believes that neither Variant, Inc. nor Variant Holdings has independent directors or executives and that all decisions by Variant, Inc. and Variant Holdings are made by and for the benefit of Wren.

46. At all times relevant to this lawsuit, Wren exerted complete domination over the finances, policy and business practices of both Variant Holdings and Variant, Inc.  Moreover, Variant, Inc. and Variant Holdings are substantially identical in terms of ownership, management, purpose, operation, and supervision.

47. Wren used his total control of Variant to commit dishonest and unjust acts in contravention of Scottrade's legal rights.

48. As described above, Wren's conduct proximately caused injury to Scottrade.

49. Wren is personally liable to Scottrade to the same extent as his alter egos Variant Holdings and/or Variant, Inc.

### Count II-Tortious Interference with Contract

50. Scottrade incorporates by reference and realleges the allegations in the preceding paragraphs.

51. The License Agreement is a valid and enforceable contract between Scottrade and Variant Holdings.

52. Defendants had knowledge of the License Agreement.

53. Defendants intentionally interfered with Variant Holdings, LLC's performance under the License Agreement by causing Variant Holdings to enter into the ELA with Variant, Inc.

54. Variant Holdings breached the rights of the Partnership by purporting to grant an exclusive license when it had already conveyed a non-exclusive license to the Partnership.

55. There was no justification for the intentional interference of Defendants Stephen Wren and Variant, Inc.

56. Defendants' interference and fraudulent concealment of that interference was willful, wanton, and malicious, entitling Plaintiff to an award of punitive damages.

57. Scottrade was damaged as a result of Defendants' conduct.

## Count III – Unjust Enrichment

58. Scottrade incorporates by reference and realleges the allegations in the preceding paragraphs.

59. By supplying in excess of $700,000 to fully fund the Partnership to develop and exploit the Intellectual Property Rights, Scottrade conferred a benefit on Wren—through his alter ego Variant Holdings.

60. Wren obtained and enjoyed the benefit conferred by Scottrade without making any payment to Scottrade – in his own capacity or through his alter ego Variant Holdings. The value of the benefit conferred on Wren without payment exceeded $4 million dollars.

61. The benefit Wren retained was at Scottrade's expense.

62. It would be unjust to allow Wren to continue to retain the benefits conferred by Scottrade.

## Count IV – Constructive Trust

63. Scottrade incorporates by reference and realleges the allegations in the preceding paragraphs.

64. Variant Holdings is Scottrade's partner in the Partnership formed pursuant to the License Agreement. As Scottrade's partner, Variant Holdings was a fiduciary and owed the highest duty of integrity and good faith in dealing with Scottrade and/or the Partnership. As a fiduciary, Variant Holdings was precluded from usurping or diverting opportunities that properly belonged to Scottrade and/or the Partnership.

65. As the alter ego of Variant Holdings, Wren owed the same fiduciary duties to the Partnership and to Scottrade.

66.     Wren, through his alter egos Variant Holdings and Variant, Inc., breached his fiduciary duties to Scottrade and the Partnership by diverting opportunities to exploit the Intellectual Property Rights the Partnership was formed to exploit.

67.     As a result of that breach of fiduciary duties, Wren was unjustly enriched in amount in excess of $4 million dollars.

68.     The laws of equity impose a constructive trust on the settlement funds that Wren obtained by virtue of his breach of fiduciary duty.

69.     Scottrade is entitled to the full amount of that constructive trust.

### Count V – Action to Enforce Arbitration Award

70.     Scottrade incorporates by reference and realleges the allegations in the preceding paragraphs.

71.     In 2004, Scottrade and Wren's alter ego, Variant Holdings, were parties to an arbitration before the American Arbitration Association in which Wren sought (a) to terminate the Partnership formed under the License Agreement and (b) to obtain a determination that Scottrade was obligated to pay 100% of the Partnership's costs.

72.     On January 14, 2005, the Arbitrator found that "each party retains all of its rights under the License Agreement" and that each party had a 50% funding obligation.  *See* **Exhibit C.**

73.     Notwithstanding the Arbitrator' Award, Wren has refused to comply with his funding obligations, as the alter ego of Variant Holdings, and has taken the position that the Partnership has terminated, in violation of Scottrade's rights under the License Agreement and Arbitrator's Award.

74.     Wren's misconduct has proximately caused Scottrade damages.

75. Accordingly, Scottrade is entitled to an order instructing Wren to comply with his obligations, as the alter ego of Variant Holdings, under the Arbitration Award and damages arising from Wren's refusal to comply with that Award.

WHEREFORE, Plaintiff Scottrade, Inc. prays that this Court enter judgment in its favor and against Defendants Stephen Wren and Variant, Inc. and award damages in excess of $75,000, with pre-judgment interest thereon, punitive damages, Plaintiff's costs and expenses for collection, reasonable attorneys' fees and such other and further relief as this Court deems appropriate.

> Respectfully submitted,
>
> THOMPSON COBURN LLP
>
>
> By */s/ Booker T. Shaw*
>     Thomas E. Douglass, #23019MO
>     Booker T. Shaw, #25548MO
>     John S. Kingston, #51403MO
>     One US Bank Plaza
>     St. Louis, Missouri  63101
>     314-552-6000
>     FAX 314-552-7000
>     tdouglass@thompsoncoburn.com
>     bshaw@thompsoncoburn.com
>     jkingston@thompsoncoburn.com
>
> *Attorneys for Plaintiff Scottrade, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2014, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

> */s/ Booker T. Shaw*